UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CITY OF DAYTONA BEACH POLICE
OFFICERS' & FIREFIGHTERS'
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                     Plaintiff,

    vs.

CHAMPIONX CORPORATION,
SIVASANKARAN SOMASUNDARAM, and
KENNETH M. FISHER,

                 Defendants.

———————————————————— x

:  Case No. 26-cv-4095

:  CLASS ACTION

:  DEMAND FOR JURY TRIAL

## COMPLAINT FOR VIOLATIONS OF THE
## FEDERAL SECURITIES LAWS

Plaintiff, the City of Daytona Beach Police Officers' & Firefighters' Retirement System ("Plaintiff"), on behalf of itself and all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by ChampionX Corporation ("ChampionX" or the "Company"), conference call transcripts, Company press releases, and media reports about the Company, as well as publicly available information about Schlumberger Limited ("SLB").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all sellers of the common stock of ChampionX between February 29, 2024 and April 1, 2024, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78j(b), 78t, and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against ChampionX and certain of the Company's senior officers and directors during the Class Period ("Defendants," defined fully below).

2.     This action arises from Defendants' repurchase of millions of dollars' worth of ChampionX shares without disclosing material nonpublic information about SLB's offers to purchase ChampionX at a premium to then-current prices, which, if disclosed as required, would have indicated to investors that ChampionX's stock was worth significantly more.

3.     The Class Period begins on February 29, 2024.  On that date, SLB approached ChampionX with a credible offer to acquire all of the Company's outstanding stock in an all-stock

transaction at a price of $36.70 per share of ChampionX common stock – a significant premium over ChampionX's then stock price of $31.06 per share. Confirming the seriousness of SLB's offer, ChampionX's Board of Directors (the "Board") held multiple discussions with senior management, including defendant Somasundaram, and ChampionX advisors to evaluate the proposal and prepare a response, including a request to increase the price to $38.50 for each share of ChampionX stock, in order for ChampionX to engage in further discussions. The Board engaged with Centerview Partners LLC ("Centerview") and Weil, Gotshal & Manges LLP ("Weil") for legal and financial advice.

4.      Later, on March 7, 2024, after ChampionX informed SLB that the Board was willing to engage in further discussions if SLB increased its offer price, SLB submitted an updated offer to acquire all of ChampionX's outstanding stock for $37.80 per share, payable in shares of SLB common stock.

5.      At the same time Defendants were evaluating these credible offers and engaging in negotiations about the terms of a potential transaction with SLB, Defendants repurchased over 216,000 of ChampionX's shares in just one month at an average price of $31.80 per share.

6.      Although ChampionX declined the terms of these offers, Defendants continued to engage with SLB, which was determined to acquire the Company and returned with repeated offers at significant premiums to ChampionX stock's market price, culminating in SLB's acquisition of ChampionX at a significant premium in July 2025.

7.      Defendants violated Section 10(b) and SEC Rule 10b-5 by failing to either abstain from trading in ChampionX's stock or to disclose SLB's offer(s) while buying back ChampionX's stock. The magnitude of the proposed transaction, the credibility of the bid by a company of SLB's stature, the degree of interest shown by SLB, and the reciprocal engagement by ChampionX, in

- 2 -

total, illustrate that the SLB's offer would have been material and significant to a reasonable investor in making their investment decision.

8.      Defendants' violations continued throughout the Class Period, as they failed to disclose the subsequent offers made by ChampionX.  In total, SLB made four offers to acquire ChampionX: (i) on February 29, 2024, at a price of $36.70 per share; (ii) on March 7, 2024, at a price of $37.80 per share; (iii) on March 29, 2024, at a price of $40.01 per share; and (iv) on March 30, 2024, at a price of $40.29 per share.  Defendants seriously considered each proposal and continued to engage with SLB even after rejecting a proposal, in the hopes of receiving an improved offer.  At the same time as these credible offers from a highly interested bidder in SLB, Defendants continued to repurchase ChampionX shares throughout the Class Period.  Specifically, as reported in the Company's SEC filings, ChampionX repurchased approximately 216,000 shares for an average price of $31.80 per share during the month of March 2024, despite knowing that SLB was offering a significant premium to ChampionX's then current stock price.

9.      On April 2, 2024, ChampionX and SLB issued a joint press release announcing the merger.

10.     ChampionX made no disclosure concerning SLB's offers for over a month, while the Company repurchased millions of dollars of its own shares at prices far below SLB's offers. In total, ChampionX repurchased nearly 216,000 of its outstanding shares from unsuspecting investors for approximately $6.9 million in March 2024, despite knowing that SLB was continuously proposing offers at a significant premium to ChampionX's then stock price.  As a result, ChampionX omitted material information about SLB's offers that the Company had a duty to disclose, in violation of the federal securities laws.

11.     When investors learned the truth that SLB was willing to buy all of the Company's outstanding stock for a significant premium above the trading price, ChampionX's stock price climbed sharply.

12.     This action seeks damages on behalf of sellers of ChampionX stock during the Class Period who were harmed as a result of these violations of the federal securities laws by Defendants.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the 1934 Act and 28 U.S.C. § 1391(b).  ChampionX's common stock was listed and traded on the Nasdaq Stock Market LLC ("NASDAQ"), which is headquartered in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ.

## PARTIES

**Plaintiff**

17.     Plaintiff, the City of Daytona Beach Police Officers' & Firefighters' Retirement System, as set forth in the accompanying certification, which is incorporated here by reference, sold ChampionX common stock during the Class Period and was damaged thereby.

- 4 -

**Defendants**

18.    Defendant ChampionX is a Delaware corporation with its corporate headquarters located at 2445 Technology Forest Blvd, Building 4, 12th Floor, The Woodlands, Texas 77381. ChampionX is a global provider of chemistry solutions, artificial lift systems, and highly engineered equipment and technologies for the drilling and production of oil and gas. On July 16, 2025, ChampionX was acquired by SLB. During the Class Period, ChampionX common stock traded in an efficient market on the NASDAQ. As of April 24, 2025, ChampionX had outstanding approximately 191.4 million shares of common stock.

19.    Defendant Sivasankaran Somasundaram ("Somasundaram") was, at all relevant times, President, Chief Executive Offer ("CEO"), and a member of the Board.

20.    Defendant Kenneth M. Fisher ("Fisher") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO").

21.    Defendants Somasundaram and Fisher were executives of ChampionX and are sometimes referred to herein as the "Individual Defendants."

22.    ChampionX, Somasundaram, and Fisher are collectively referred to herein as "Defendants."

23.    The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of ChampionX's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Because of their positions within the Company and their access to material, nonpublic information, the Individual Defendants knew that the facts specified herein had not been disclosed to and were being concealed from the public. The Individual Defendants also knew about and/or had control over the Company's stock repurchase plans. As

such, the Individual Defendants are liable for ChampionX's repurchase of its own common stock while in possession of material, non-public information, in violation of the federal securities laws.

24. Defendants are liable for failing to disclose nonpublic facts known to them about ChampionX and the true market value of its common stock. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on sellers of ChampionX common stock was a success, as it: (i) deceived the investing public regarding ChampionX's prospects; (ii) artificially deflated the market price of ChampionX common stock; and (iii) caused Plaintiff and other members of the Class (defined herein) to sell ChampionX common stock at artificially deflated prices.

25. The Individual Defendants caused ChampionX's common stock to trade at artificially depressed or deflated levels during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of, and had the ability and opportunity to prevent the issuance or cause the correction of, ChampionX's public statements. Because of their positions with the Company and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the facts specified in this Complaint had not been disclosed to and were being concealed from the market.

## RELEVANT NON-PARTIES

26. SLB is a Curaçao corporation with corporate headquarters located at 5599 San Felipe, 17th Floor, Houston, Texas, 42 rue Saint-Dominique, Paris, France, and Parkstraat 83, The Hague, The Netherlands. SLB is a global technology company focusing primarily on digital solutions, reservoir performance technologies and services, well construction products and

services, and production systems technologies.  On July 16, 2025, SLB acquired all outstanding common stock of ChampionX.

27.    Olivier Le Peuch ("Le Peuch") has served as SLB's CEO since 2019 and a member of SLB's Board of Directors since 2019.

### DEFENDANTS' FRAUDULENT SCHEME

28.    On March 7, 2022, the ChampionX Board approved a share repurchase program under which ChampionX could repurchase up to $250 million of its outstanding common stock (the "2022 Program").  Over the years, the Board approved additional share repurchase plans.  On January 31, 2024, the Board approved an increase in the aggregate value of shares that could be repurchased under the 2022 Program to $1.5 billion (the "2024 Program"), the second such increase approved by the Board.

29.    Under the 2024 Program, shares could be repurchased from time to time in open market transactions or in privately negotiated transactions, and the timing and the other terms of the repurchase depended on a variety of factors, including legal requirements, economic and market conditions, and other investment opportunities.

30.    As detailed further herein, at the time that ChampionX was repurchasing ChampionX stock throughout the Class Period, Defendants knew that ChampionX had received a formal acquisition offer from SLB to purchase all outstanding shares of ChampionX common stock at prices significantly above the then-current market prices of ChampionX common stock, and therefore significantly above the prices at which ChampionX was repurchasing ChampionX common stock from unsuspecting Class members.  Accordingly, ChampionX had an obligation to disclose that it had received a formal acquisition offer from SLB or abstain from purchasing

ChampionX stock from unsuspecting investors.  ChampionX did not disclose this material information during the Class Period.

31.    Prior to the start of the Class Period, ChampionX had from time to time engaged in conversations about potential strategic transactions involving ChampionX with senior executives of other companies in the industry.

32.    For example, in August 2023, defendant Somasundaram met in Houston, Texas, with the CEO ("CEO A") of an oil and gas company ("Company A").  During the meeting, CEO A raised the possibility of a potential business combination between ChampionX and Company A.  Defendant Somasundaran informed the Board of these discussions, who supported engaging in preliminary discussions with Company A about a potential transaction.  Thereafter, ChampionX's management and its advisors considered the terms of a potential transaction involving Company A.  ChampionX and Company A subsequently ceased discussions after Party A indicated that it would not proceed with ChampionX's requirement that the transaction involve a meaningful premium to ChampionX stockholders.

33.    On November 15, 2023, defendant Somasundaram met in Houston, Texas, with the CEO ("CEO B") of another oil and gas company ("Company B").  During the meeting, CEO B raised the possibility of a potential combination between ChampionX and Company B.  Defendant Somasundaram informed the Board of these discussions.  Discussions between ChampionX and Company B ceased after Defendant Somasundaram informed Company B that the potential transaction did not offer compelling strategic merits.

34.    On December 8, 2023, SLB initiated its outreach to explore a potential transaction with ChampionX.  On that date, defendant Somasundaram met in Houston, Texas, with Le Peuch, the CEO of SLB.  During the meeting, Le Peuch expressed interest in pursuing a business

combination between ChampionX and SLB and discussed the strategic benefits and synergies of a potential transaction.  Le Peuch also indicated that if ChampionX were interested, SLB would prepare a proposal.

35.    That same day, the Board, including defendant Somasundaram, held a meeting to discuss the potential strategic transactions.  During the meeting, the Board indicated that it would be willing to consider a proposal from bidders, such as SLB, and reiterated its position that any transaction should result in a meaningful premium to ChampionX shareholders.

36.    On January 3, 2024, Jim Hackett, the Chair of the Board of Directors of SLB, contacted David W. Rabun, the Chair of ChampionX's Board to affirm SLB's interest in a potential transaction with ChampionX.  During the discussion, Rabun indicated that the Board would consider a proposal from SLB but that any such proposal would need to deliver a meaningful premium to ChampionX shareholders.

37.     In January 2024, ChampionX and SLB met several additional times.  SLB indicated that it was preparing to submit a proposal to acquire all of the issued and outstanding shares of ChampionX common stock in an all-stock transaction.  ChampionX continually reiterated its position that any proposal would need to deliver a meaningful premium to ChampionX shareholders.

38.    As demonstrated in the chart below at paragraph 64, prior to the Class Period, Defendants repurchased 1,395,031 shares of ChampionX common stock for an average price of $30.11 per share during the period from January 1, 2024, through January 21, 2024, after receiving significant indications of interest from other companies in the industry, including SLB.

39.    The Class Period begins on February 29, 2024 – ChampionX's stock opened at $31.12.  On that day, defendant Somasundaram met in Houston, Texas, with Le Peuch.  During

the meeting, Le Peuch delivered to ChampionX a letter setting forth SLB's first offer to acquire all of the outstanding ChampionX common shares in an all-stock transaction at a price of $36.70 per share of ChampionX common stock, payable in shares of SLB common stock (the "First SLB Proposal"). The First SLB Proposal did not include a proposed exchange ratio with respect to the contemplated stock consideration to be issued in the transaction. Confirming the credibility of the First SLB Proposal, defendant Somasundaram shared the First SLB Proposal with the Board and ChampionX's advisors. Moreover, that same day, defendant Somasundaram informed CEO B that the potential transaction with Company B did not present a sufficiently attractive opportunity for ChampionX shareholders.

40. On March 1, 2024, the Board held a call with members of ChampionX's senior management, including defendant Somasundaram. Additionally, representatives from Centerview, ChampionX's financial advisor, and representatives from Weil, ChampionX's legal advisor were present. During the meeting, the Board discussed its preliminary view of the First SLB Proposal.

41. On March 5, 2024, the Board held a meeting with members of ChampionX's senior management, including defendant Somasundaram, as well as representatives from Centerview and Weil. During the meeting, the Board discussed the First SLB Proposal, including the implied exchange ratio of 0.759 shares of SLB common stock for each share of ChampionX common stock based on the closing price of SLB common stock as of February 29, 2024. Centerview discussed the stock price performances of ChampionX and SLB, the value of SLB common stock to be issued as consideration, and the strategic benefits and risks of a potential transaction. According to the Definitive Proxy Statement (at 51) relating to the merger, filed with the SEC on May 15, 2024 (the "Proxy Statement"), the Board determined that the First SLB Proposal "did not represent sufficient

value to holders of ChampionX common stock." The Board, however, did not close the door on a potential transaction with SLB. The Board "expressed their support for engaging in preliminary discussions regarding a potential all-stock transaction with SLB, subject to SLB increasing the proposed price for each share[.]" The Board then authorized defendant Somasundaram to request from SLB an increase in price to $38.50 for each share of ChampionX common stock, in order for the companies to engage in further discussions. Thus, even though ChampionX determined to decline the First SLB Proposal, Defendants were aware that SLB was motivated to complete a transaction and could return with an improved offer. The Board also determined that it was appropriate to retain Centerview as financial advisor in connection with the potential transaction, subject to any conflicts of interest. ChampionX subsequently, on April 1, 2024, entered into a formal engagement letter with Centerview.

42. On March 7, 2024, defendant Somasundaram, on behalf of the Board, informed Le Peuch that the First SLB Proposal was not sufficiently attractive to pursue a transaction. Defendant Somasundaram noted, however, that the Board would be willing to engage in further discussions if SLB would increase the offer price to $38.50 for each share of ChampionX common stock, payable in shares of SLB common stock.

43. That same day, SLB sent defendant Somasundaram a revised proposal to acquire all of the outstanding ChampionX common shares at a price of $37.80 per share of ChampionX common stock, payable in shares of SLB common stock (the "Second SLB Proposal"). The Second SLB Proposal indicated, among other things, that SLB expected to complete due diligence within 20 business days following March 12, 2024. The Second SLB Proposal proposed that ChampionX agree to a 30-day mutual exclusivity period and enter into a mutually acceptable confidentiality agreement. Defendant Somasundaram shared the Second SLB Proposal with the

Board and its advisors on the same date.  The closing price of ChampionX common shares on March 7, 2024, was $31.76 per share.

44.    Later that same day, the Board held a meeting with senior management, including defendant Somasundaram, as well as representatives from Centerview.  During the meeting, the Board discussed the Second SLB Proposal, including the implied exchange ratio of 0.744 shares of SLB common stock for each share of ChampionX common stock based on the closing price of SLB common stock as of March 7, 2024.  After review and discussion of the revised offer price, the Board expressed their support for moving forward with preliminary discussions and entering into a confidentiality agreement with SLB.

45.    On March 8, 2024, defendant Somasundaram communicated to Le Peuch, among other things, that ChampionX was interested in proceeding with preliminary discussions regarding a potential transaction with SLB and in entering into a mutually acceptable confidentiality agreement.  That same day, ChampionX and SLB entered into a confidentiality agreement that did not include standstill restrictions applicable to SLB.

46.    Despite agreeing that it would be in the best interest of ChampionX shareholders to share strategic and financial information with SLB after receiving the Second SLB Proposal, Defendants consciously chose not to tell the public about its agreement to share financial information with SLB, nor SLB's offers to acquire ChampionX.

47.    Beginning on March 13, 2024, ChampionX, SLB, and their respective advisors conducted diligence on the other party, including financial, operational, legal and regulatory, accounting and tax diligence.  Members of ChampionX's management engaged in these due diligence calls and meetings with, and responded to written due diligence requests from, representatives of SLB.  Representatives of Centerview also attended these calls and meetings.

48.    On March 15, 2024, the Board held a meeting with members of ChampionX's senior management, including defendant Somasundaram, as well as representatives from Centerview and Weil. During the meeting, the Board discussed the potential transaction with SLB and the progress of ongoing due diligence. The Board also discussed the increase in both ChampionX and SLB's respective stock prices and the impact of such movement on the implied share price of ChampionX from the Second SLB Proposal. After discussion, the Board determined that the parties would need to align on a final exchange ratio and directed ChampionX management to finalize due diligence.

49.    On March 18, 2024, Lathan & Watkins LLP ("Latham"), SLB's legal advisor, sent Weil an initial draft of the merger agreement.

50.    On March 22, 2024, the Board held a meeting with members of ChampionX's senior management, including defendant Somasundaram, as well as representatives from Centerview and Weil. During the meeting, the Board discussed the potential synergies with SLB, key terms proposed by the draft merger agreement, and the exchange ratio of 0.744 implied by the Second SLB Proposal's offer price of $37.80 for each share of ChampionX common stock, based on the closing trading price of SLB common stock as of March 7, 2024. After discussion, the Board authorized defendant Somasundaram to discuss the exchange ratio of 0.744 with Le Peuch.

51.    On March 24, 2024, defendant Somasundaram spoke with Le Peuch to discuss the proposed exchange ratio with respect to the transaction. Defendant Somasundaram proposed an exchange ratio of 0.744 for the potential transaction, given the implied exchange ratio from the Second SLB Proposal. Le Peuch indicated that the SLB Board would not support this exchange ratio, but SLB would continue to negotiate transaction terms.

- 13 -

52.    On March 26, 2024, Saurabh Nitin, Senior Vice President, Corporate Strategy, Development and Energy Transition of ChampionX, emailed Vijay Kasibhatla, Director, Mergers and Acquisitions of SLB, reiterating ChampionX's position that the exchange ratio for the proposed transaction should equal 0.744 shares.  The email detailed ChampionX's rationale for its position.

53.    On March 27, 2024, defendant Somasundaram met in Houston, Texas, with Le Peuch.  During the meeting, Le Peuch, on behalf of SLB, proposed an exchange ratio for the transaction of 0.72 shares of SLB common stock for each share of ChampionX common stock. Defendant Somasundaram indicated that the exchange ratio did not provide sufficient value for ChampionX stockholders, given the increases in both companies' share prices since the Second SLB Proposal.  Defendant Somasundaram suggested that ChampionX pay its stockholders a special cash dividend prior to the closing of the potential transaction to address the gap in value. Le Push indicated that SLB would consider the exchange ratio and the special cash dividend.

54.    On March 28, 2024, the Board held a meeting with members of ChampionX's senior management, including defendant Somasundaram, as well as representatives from Centerview and Weil.  During the meeting, the Board discussed the potential benefits and synergies of a transaction based on diligence findings and key terms of the draft merger agreement. After discussion of the prior day's meeting between defendant Somasundaram and Le Peuch, the Board considered the range of potential exchange ratios that could be applicable in the potential transaction, the implied value of these exchange ratios, and ways to address gaps in valuation between the parties, including a special cash dividend to ChampionX stockholders.  The Board determined that ChampionX should continue discussions with SLB on the potential transaction.

55.     Then, on March 29, 2024, after nearly a month of due diligence, Le Peuch, on behalf of SLB, delivered a letter to defendant Somasundaram memorializing a transaction proposal, which proposed, among other things, an exchange ratio of 0.73 shares of SLB common stock for each share of ChampionX common stock (the "Third SLB Proposal").  Based on the closing price of SLB common stock as of March 28, 2024, this exchange ratio implied a price of $40.01 per share of ChampionX common stock, payable in shares of SLB common stock.  The Third SLB Proposal did not provide for special cash dividends for ChampionX shareholders.  The closing price of ChampionX common stock on March 28, 2024, was $35.89 per share.[1]  The Board and ChampionX's advisors were made aware of the Third SLB Proposal that same day.

56.     Also on March 29, 2024, Latham sent Weil a revised draft merger agreement that reflected terms consistent with the Third SLB Proposal.

57.     That same day, the Board held a meeting with members of ChampionX's senior management, including defendant Somasundaram, as well as representatives from Centerview and Weil.  During the meeting, the Board discussed the terms of the Third SLB Proposal, including preliminary financial analyses of the proposed exchange ratio and the value contemplated by the proposal.  The Board also discussed the contractual rights to pursue alternative transactions and transaction certainty and determined that neither the proposed termination fee of 3.25% of ChampionX's enterprise value, nor the stockholder vote provision, would preclude any other potential acquirer from making a proposal to acquire ChampionX following the announcement of the potential transaction.  The Board directed defendant Somasundaram to prepare a written proposal to SLB with terms consistent with the Board's discussion.

---

[1] In observance of Good Friday, the NASDAQ was closed on March 29, 2024.

58.     Later that day, defendant Somasundaram submitted a written response to the Third SLB Proposal, which proposed, among other things, an exchange ratio of 0.73 shares of SLB common stock for each share of ChampionX common stock, and the ability of the Board to declare and to pay a special cash dividend of $0.60 for each share of ChampionX common stock prior to the closing of the potential transaction.

59.     The next day, on March 30, 2024, Le Puech contacted defendant Somasundaram and informed him that SLB would be sending a revised non-binding proposal, which represented SLB's final position with respect to the economic terms of the potential transaction.  Thereafter, Le Peuch, on behalf of SLB, sent defendant Somasundaram a revised proposal, which proposed, among other things, an exchange ratio of 0.735 shares of SLB common stock for each share of ChampionX common stock, with no special cash dividend to ChampionX stockholders prior to the closing of the potential transaction (the "Final SLB Proposal").  Based on the closing price of SLB common stock as of March 28, 2024, this exchange ratio implied a price of $40.29 per share of ChampionX common stock, payable in shares of SLB common stock.  The closing price of ChampionX common stock on March 28, 2024, was $35.89 per share.  The Board and ChampionX's advisors were made aware of the Final SLB Proposal that same day.

60.     That same day, the Board held a meeting with members of ChampionX's senior management, including defendant Somasundaram, as well as representatives from Centerview and Weil.  During the meeting, the Board discussed the terms of the Final SLB Proposal, including preliminary financial analyses of the proposed exchange ratio of 0.735 shares of SLB common stock for each share of ChampionX common stock.  After discussion, the Board expressed their support for the terms of the Final SLB Proposal, including the exchange ratio, subject to the finalization of the transaction documents.  Later that day, defendant Somasundaram informed Le

Peuch of ChampionX's acceptance of the Final SLB Proposal. After over a month of negotiations following the First SLB Proposal, Defendants still had not apprised investors of the potential transaction.

61.    On the morning of April 2, 2024, ChampionX and SLB executed a merger agreement memorializing the acquisition of ChampionX.

62.    On April 2, 2024, prior to market open, ChampionX and SLB issued a joint press release announcing the execution of the merger agreement. Finally, more than a month after receiving the First SLB Proposal and repurchasing ChampionX shares, Defendants apprised investors that SLB was willing to pay a significant premium over the market price for ChampionX common stock. On this news, ChampionX's common stock price rose to $39.09 at market close on April 2, 2024, a 10.4% increase over the closing price on the prior trading day.

63.    After the Class Period, on April 25, 2024, ChampionX filed on Form 10-Q its financial results for first quarter ended March 31, 2024 (the "1Q24 Form 10-Q"), which was signed by Antoine Marcos, the Vice President, Corporate Controller and Chief Accounting Officer of ChampionX. In the 1Q24 Form 10-Q, ChampionX disclosed that, in the quarter ended March 31, 2024 ("1Q24"), it had repurchased 1,611,055 shares of ChampionX common stock at an average price of $30.33, for a total of approximately $48.86 million dollars.

64.    The 1Q24 Form 10-Q included ChampionX's share repurchases in 1Q24 by month, depicted below:

| Date | Total Number of Shares Purchased | Average Price Paid per Share |
|---|---|---|
| January 1, 2024 through January 31, 2024 | N/A | N/A |
| February 1, 2024 through February 29, 2024[2] | 1,395,031 | $30.11 |
| March 1, 2024 through March 31, 2024 | 216,024 | $31.80 |
| **Total** | **1,611,055** | **$30.33** |

65.    Prior to March 1, 2024, Defendants had already received the First SLB Proposal (at a price of $36.70 per share) on February 29, 2024.  Between March 1, 2024, and March 31, 2024, Defendants received the Second SLB Proposal (at a price of $37.00 per share) on March 7, 2024, and also received the Third SLB Proposal (at a price of $40.01 per share) on March 29, 2024, and the Fourth SLB Proposal (at a price of $40.29 per share) on March 30, 2024, during this window. Despite knowing that SLB was willing to pay between 15.4%-26.7% more than the average $31.80 price per share ChampionX was paying to its shareholders, Defendants refused to disclose this information to investors in order to keep ChampionX's common stock price artificially deflated.

### DEFENDANTS ACTED WITH SCIENTER

66.    ChampionX and the Individual Defendants acted with scienter because Defendants had actual knowledge of the material undisclosed facts concerning SLB's credible offer(s) to acquire ChampionX shares at materially higher prices.

67.    Defendants were aware of the details and timing of SLB's offers.    SLB communicated its offers to the highest executive level of ChampionX – delivering its offers

---

[2] The 1Q24 Form 10-Q lists a Period range from February 1, 2024, through February 28, 2024, which does not account for the additional day from the leap year.

directly to defendant Somasundaram – and its offers were discussed at multiple Board meetings, which were attended by defendants Somasundaram and/or Fisher.

68.    Defendants were aware of ChampionX's repurchases of millions of dollars of its own stock.  Among other things, Defendants disclosed these repurchases in the 1Q24 Form 10-Q filed in April 2024. The Individual Defendants each signed Certifications pursuant to Rule 13a-14(a) and Rule 15d-14(a) of the 1934 Act stating that they had reviewed the 1Q24 Form 10-Q and that based on their knowledge, the 1Q24 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…"

69.    The Individual Defendants were also the two most senior executives of the Company and were thus familiar with ChampionX's share repurchase program.

70.    Defendants were aware of the market price of ChampionX's stock and were therefore aware that SLB's offers were at prices materially above the market price, as well as that ChampionX's repurchases were at prices materially below SLB's offers.  Defendants were also aware that, even if they rejected an offer, SLB could return with an improved offer.

71.    The magnitude of pace of ChampionX's stock repurchases during the Class Period also supports a strong inference of scienter.  ChampionX repurchased approximately $6.9 million worth of stock during the Class Period.  Even prior to the Class Period, Defendants had received indications of interest from companies to pursue potential transactions, including SLB, and thereafter repurchased approximately $42 million worth of stock during the month of February 2024.

72.    In addition to Defendants' actual awareness of the undisclosed material facts, the inference of scienter is enhanced further by the financial motive Defendants had for ChampionX

to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose SLB's offer to acquire those shares at materially higher prices.

## LOSS CAUSATION AND ECONOMIC LOSS

73.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the prices of ChampionX common stock and operated as a fraud or deceit on sellers of ChampionX common stock.  As detailed above, when the truth about Defendants' misconduct concerning SLB's offers to purchase the company was revealed, the price of ChampionX common stock increased precipitously as the prior artificial deflation came out.  The increase in the price of ChampionX common stock was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price increase negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially deflate the prices of ChampionX common stock and the subsequent significant increase in the value of ChampionX common stock when Defendants' fraudulent conduct was revealed.

74.    At all relevant times, Defendants' repurchases of ChampionX common stock required them to disclose the material, non-public information in their possession.  Defendants did not, and as such caused the price of ChampionX common stock to be artificially deflated.  Plaintiff and other Class members sold ChampionX common stock at those artificially deflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

75.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

76.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for ChampionX common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     ChampionX common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)     ChampionX regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     ChampionX was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

77.     As a result of the foregoing, the market for ChampionX common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in ChampionX common stock during the Class Period suffered similar injury through

their transactions in ChampionX common stock at artificially deflated prices and a presumption of reliance applies.

78.    Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members sold ChampionX common stock between the time Defendants omitted, misrepresented, and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for ChampionX common stock, and are entitled to a presumption of reliance during the Class Period.

## CLASS ACTION ALLEGATIONS

79.    Plaintiff brings this action on behalf of all sellers of ChampionX common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company ("Excluded D&Os"), the Defendants' and the Excluded D&Os' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants or Excluded D&Os have or had a controlling interest.

80.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ChampionX common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ChampionX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares were held by hundreds or

thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

81. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

82. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

83. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants failed to disclose material facts required to be disclosed and/or omitted or misrepresented material facts;

(c) whether Defendants acted with scienter;

(d) whether the prices of ChampionX common stock during the Class Period were artificially deflated because of Defendants' conduct complained of herein; and

(e) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

84. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Treatment as a class will permit a large number of similarly situated person to prosecute their common claims in a

single forum simultaneously, efficiently, and without the duplication effort or expense that numerous individual actions would require.

85.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

86.     No difficulties are likely to be encountered in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the 1934 Act and SEC Rule 10b-5
### Against ChampionX

87.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.     During the Class Period, Defendants had access to the material, nonpublic confidential information concerning the Company and its true prospects alleged herein at ¶¶ 28-65.

89.     Notwithstanding their duty to refrain from trading in ChampionX common stock unless they disclosed those material, nonpublic, favorable facts alleged herein, and in violation of their fiduciary duties to Plaintiff and other members of the Class, Defendants caused ChampionX to purchase more than two hundred thousand shares of ChampionX common stock at artificially deflated prices.

- 24 -

90.     The magnitude of the proposed transaction, the credibility of the bid by a company of SLB's stature, the degree of interest shown by SLB, and the reciprocal engagement by ChampionX, in total, illustrate that the SLB's offer would have been material and significant to a reasonable investor in making their investment decision.

91.     Defendants caused ChampionX to purchase those shares of common stock, as alleged above, at market prices artificially deflated by the nondisclosure of material, nonpublic, favorable facts during the Class Period.

92.     Defendants knew that they were in possession of material, nonpublic, favorable information that was not known to the investing public, including Plaintiff and other members of the Class.  Before purchasing that common stock from the public, Defendants were obligated to disclose that material, nonpublic favorable information to Plaintiff and other members of the Class.

93.     By reason of the foregoing, Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud, and engaged in acts and transactions and a course of business which operated as a fraud or deceit upon members of the investing public who sold ChampionX common stock during the Class Period.

94.     Plaintiff and other members of the Class who sold shares of ChampionX common stock: (i) have suffered substantial damages because they relied upon the integrity of the market and sold shares of ChampionX common stock at artificially deflated prices as a result of the violations of Section 10(b) and SEC Rule 10b-5 alleged herein; and (ii) would not have sold ChampionX common stock at the prices they sold at, or at all, if they had been aware that the market prices had been artificially and falsely deflated by Defendants' concealment.  At the time

- 25 -

of the sales by Plaintiff and members of the Class, the fair and true value of ChampionX common stock was substantially more than the prices at which they sold their shares.

95. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their sales of ChampionX common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

96. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

97. During the Class Period, the Individual Defendants acted as controlling persons of ChampionX within the meaning of Section 20(a) of the 1934 Act. By virtue of their positions within the Company, and their power to control public statements about ChampionX, the Individual Defendants had the power and ability to control the actions of ChampionX and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding Plaintiff and the members of the Class damages and interest;

(c) Awarding Plaintiff's reasonable costs, including attorneys' fees; and

(d)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 15, 2026

_/s/ Joshua W. Ruthizer_
Joshua W. Ruthizer

**WOLF POPPER LLP**
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Justyn Millamena
jmillamena@wolfpopper.com
570 Lexington Avenue, 19th Floor
New York, NY 10022
Telephone: 212-759-4600

_Counsel for Plaintiff_

**CERTIFICATION OF THE CITY OF DAYTONA BEACH
POLICE OFFICERS' & FIREFIGHTERS' RETIREMENT SYSTEM
PURSUANT TO THE PRIVATE SECURITIES LITIGATION REFORM ACT**

I, James Maher, on behalf of the City of Daytona Beach Police Officers' & Firefighters' Retirement System ("Daytona Beach POFRS"), declare the following as to the claims asserted or to be asserted under the federal securities laws:

1.      I am the Chairman of the Board of Daytona Beach POFRS. I am authorized to execute this certification on behalf of Daytona Beach POFRS and authorized to initiate this litigation on behalf of Daytona Beach POFRS.

2.      Daytona Beach POFRS has reviewed a draft of complaint for violations of the federal securities laws against ChampionX Corporation, Sivasankaran Somasundaram, and Kenneth M. Fisher, and authorized its filing.

3.      Daytona Beach POFRS did not engage in transactions in the securities that are the subject of this complaint at the direction of its counsel, or in order to participate in any private action arising under the federal securities laws.

4.      Daytona Beach POFRS is willing to serve as a representative party on behalf of the Class, as defined in the complaint, including providing testimony at deposition and trial, if necessary.

5.      Daytona Beach POFRS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the class.

6.      Below is a list of all of Daytona Beach POFRS's transactions in the securities that are the subject of the complaint during the Class Period specified in the Complaint:

7.      During the three-year period preceding the date of signing this certification, Daytona Beach POFRS has sought to serve or has been appointed as a lead plaintiff or representative party on behalf of an asserted class in the following actions:

*Chang v. Neumora Therapeutics, Inc. et al.*, No. 1:25-cv-01072 (S.D.N.Y. May 5, 2026)

**[remainder of page left blank]**

1

8.      Daytona Beach POFRS will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages, relating to the representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: May 15, 2026

By: _____
James Maher, Chair
City of Daytona Beach Police Officers' &
Firefighters' Retirement System

2

Docusign Envelope ID: 83D41203-5351-8192-82BB-A5015EFEA582

## SCHEDULE A

## CHAMPIONX CORP. COMMON STOCK TRANSACTIONS

| Date | Transaction | Shares | Price Per Share * |
|------|-------------|--------|-------------------|
| 3/7/2024 | Sale | 81 | $31.786 |

\* Per share prices are rounded to three decimal places.

3